*NOT FOR PUBLICATION*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

—————————————————————————
                              :

VANESSA HOWARD,              :

                             :       Civil Action No.: 16-6624 (FLW)

                Plaintiff,    :

                             :           **OPINION**

    vs.                         :

                             :

COUNTY OF MONMOUTH,     :

                             :

               Defendant.    :

—————————————————————————:

### WOLFSON, Chief Judge:

Plaintiff Vanessa Howard ("Plaintiff"), an African American female, alleges that her employer, defendant County of Monmouth ("Defendant" or "County"), intentionally refused to promote her, in violation of the New Jersey Law Against Discrimination ("NJLAD"), N.J.S.A. § 10:5-3, *et seq.*, and the Family Medical Act ("FMLA"), 29 USC. § 28, *et seq*. Defendant moves for summary judgment pursuant to Federal Rule of Civil Procedure 56. For the reasons set forth below, Defendant's motion is **GRANTED**.

## I.     FACTUAL BACKGROUND AND PROCEDURAL HISTORY

The following facts are undisputed unless otherwise noted. Plaintiff is an African American female who began working for the Monmouth County Correctional Institution ("MCCI") as a corrections officer in February 2012. Def. Facts, ¶¶1-2. In 2015, Plaintiff applied for a promotion to the position of Investigator of Secured Facilities. *Id.* at ¶16.

### A.  The New Jersey Civil Service Commission Rules Governing Promotions

1

The rules and regulations imposed by the New Jersey Civil Service Commission (the "Commission") govern promotion decisions regarding county correction officers. *Id.* at ¶4. After appointment as a corrections officer, to be considered for a promotion, a candidate must satisfy a "time in rank requirement," as well as any minimum job qualifications for the specific position sought, and pass the appropriate Civil Service exam for that position. *Id.* at ¶3. After the administration of the exam, the Commission certifies the "eligible/failure roster" – a list delineating which test takers passed or failed. *Id.* at ¶14. The appointing authority, in this case Defendant on behalf of the MCCI, then has the opportunity to request that individuals on the list be removed because they do not meet the job qualifications or for other causes. *Id.* at ¶17. The Civil Service Commission then certifies the final list. *Id.*

Further, like vacancies for all civil service positions in the state of New Jersey, promotion decisions are subject to the "rule of three." *see* N.J.S.A. 11A:4-8; *Commc'ns Workers of Am., AFL-CIO v. New Jersey Civil Serv. Comm'n*, 191 A.3d 643, 667 (N.J. 2018). Under the rule of three, the appointing entity must choose from the three highest scoring candidates in filling a vacancy, after eliminating those individuals who do not satisfy the minimum job qualifications or who were removed for cause. *Commc'ns Workers of Am., AFL-CIO*, 191 A.3d at 667.

The Commission maintains a list of minimum qualifications for each position. Def. Facts ¶5. For the position of Investigator of Secured Facilities, the applicant was required to possess, at minimum, a bachelor's degree[1], one-year experience in the custodial field, and "qualify in the use

---

[1] The posting for the position also provided that in lieu of a Bachelor's degree, an applicant may substitute four years of on the job experience. Certification of Robyn B. Gigl ("Gigle Cert"), Ex. I, "Promotional Announcement Investigator of Secured Facilities."

of firearms on an annual basis." *Id.* at ¶5; *see also* Gigle Cert, Ex. I, "Promotional Announcement Investigator of Secured Facilities."

### B. <u>Firearms Qualifications for Corrections Officers</u>

Corrections officers are not required to be firearms certified and can choose whether to carry a weapon. Foster Cert., Ex. 10, Tift Dep, 13:6-19. If they choose to do so, they must maintain a firearms qualification and are subject to the Attorney General's Guidelines on Firearms Qualifications ("Guidelines"). Certification of Principal Investigator Jeffrey Equils ("Equils Cert.") Equils Cert., ¶17. The Guidelines provide that in order to be firearms qualified, an individual must undergo a semi-annual qualification process, which consists of "two prescribed qualification sessions within a 12-month period (a calendar year), with at least three months between each qualification." Foster Cert., Ex. 14, "Monmouth County Sheriff's Office Policy and Procedures"; *see also* Equils Cert., Ex. A, "New Jersey Attorney General's Guidelines on Firearms Qualifications." The "qualification sessions" are practical firearms examinations on the shooting range. Equils Cert., ¶21. Additionally, individuals must take a firearms class each year. Equils Cert., Ex. A; *see also* Equils Cert. ¶18.

At the MCCI, the firearms course and the practical firearms qualification tests are typically offered during a two-week period in both the spring and fall. In 2015, the firearms class was offered six times: February 23, March 3, March 10, August 7, August 20, and August 28. Equils Cert, Ex. B. Similarly, the shooting range was open for the practical qualification test four times in both the spring and fall: March 16-31, April 1-3, September 14-30, and October 1-10. *Id.*

### C. <u>Plaintiff's Application for the Promotion</u>

In April 2015, the County sought applications for a provisional Investigator of Secured Facilities to serve pending the administration of the Civil Service Exam and selection of a permanent Investigator of Secured Facilities. Def. Facts, ¶¶6, 9. The job posting for the

provisional position provided that as "minimum job qualifications," the applicant must possess a "[m]inimum of five years of employment experience," have "[n]o MAJOR discipline on record," "[h]have an excellent attendance record," and be "firearms qualified." Gigle Cert, Ex. D, "Job Opportunity Posting Investigator Secured Facilities." These requirements were additional qualifications established by the County, separate from the Commission's minimum requirements for the position. Def. Facts, ¶¶9-10. Although Plaintiff did not apply for the provisional position, she took the civil service exam and applied for the permanent position. *Id*. at ¶12

When the exam results were released in November 2015, Plaintiff was the highest-scoring applicant and number one on the eligible/failure roster. *Id.* at ¶¶15-16; *see also* Foster Cert., Ex. 12, Eligible Failure Roster for the Position of Investigator of Secured Facilities. However, Principal Investigator Jeffrey Equils, who oversaw the hiring process for the position, sought to have Plaintiff removed from the roster of eligible individuals, because he did not believe Plaintiff satisfied the requirements. *Id.* at ¶¶21-23. Investigator Equils documented his reasoning for removing Plaintiff, and another female applicant[2], in a memorandum to Suzanne Ogborne, the Assistant Director of Human Resources for the County. *Id.* at ¶¶22-23. Investigator Equils reasoned that Plaintiff had only been employed for three years and eight months, and thus she did not have five years of experience as a corrections officer; had used an unacceptable amount of sick time; and was not firearms qualified. Accordingly, Plaintiff did not satisfy the additional requirements delineated on the provisional job posting. *Id.* at ¶23; *see also* Certification of Suzanne K. Ogborne ("Ogborne Cert."), Ex. A. Regarding Plaintiff's sick time, Investigator Equils explained that Plaintiff's attendance was "unacceptable" because she had used nine days of sick

---

[2] The other applicant was removed from the eligible/failure roster for cause because she had been subject to "major discipline." Def. Facts, ¶22.

leave in 2012, fourteen days in 2013, and fifteen days in 2014. Ogborne Cert, Ex. A, at 1. In Equils' view, although Plaintiff had never been disciplined for absenteeism and her sick leave usage fell below the contractually permitted maximum of fifteen days per year, her attendance was inadequate because the use of more than seven sick days per year without documentation is unacceptable for officers that "apply for or hold any type of specialized detail or promotion." *Id.* Regarding Plaintiff's lack of firearms qualification, Investigator Equils noted that in order to become firearms qualified, an individual must attend a classroom training and conduct two practical firearms qualification tests during the calendar year. *Id.* at 2. Due to the timing of the tests, the earliest Plaintiff could become firearms qualified would be September 2016, nearly a year after the test results were published. *Id.* at 2. Accordingly, Ms. Ogborne submitted a list of candidates to the Commission and requested Plaintiff's removal. Ogborne Cert., ¶244. Subsequently, three corrections officers – all white males – were interviewed for the position, and the permanent position was given to one of those applicants. *Id.* at ¶26.

Plaintiff was firearms qualified when she graduated from the police academy in 2013 but allowed the qualification to lapse sometime in 2014, approximately a year before applying for the promotion. Gigle Cert, Ex. C, Deposition of Vanessa Howard, T155:2. As a result, Plaintiff was not firearms qualified when she applied for the promotion. *Id.* However, Plaintiff contends that she attempted to obtain her firearms qualification, but was unable to do so.

Upon learning that she would not be interviewed for the permanent position, Plaintiff filed a union grievance contesting the hiring process. Gigle Cert., Ex. H. Plaintiff's chief complaints were that her sick leave should not have been considered and that she was penalized for her lack of firearms qualification. *Id.* at 2. Plaintiff contended that she had used FMLA leave for some of her absences and under the terms of the union contract, "[d]iscipline for pattern setting will not be

brought unless an employee has used his/her allotted 15 days of sick leave in a given year." *Id.*

Plaintiff also protested the County's failure to offer her a "special firearms qualification" and noted

that other officers had obtained their firearms qualification outside of the typical testing period and

were provided with firearms without undergoing the bi-annual requisite testing. *Id.*

Plaintiff's union grievance detailed that she spoke to Sergeant Byron Jones, the Firearms

Training Supervisor about visiting the shooting range to take the practical examination, that he

seemed receptive, and "would try to get [her] on the range after he confer[ed] with [Sergeant] Tift

[the Firearms Training officer]." Gigle Cert, Ex. H. Sergeant Jones testified that when Tift came

to him "toward the end of the year" in "2014 or 2015" to ask if there were a way to accommodate

Plaintiff, where MCCI is located, and arrange a special firearms testing session, he denied the

request for two reasons. Jones Dep, T72:13 to 73:4.[3] First, Middletown township does not have its

own shooting range, and typically rents a shooting range from Middlesex County or a neighboring

county or town, and Jones did not believe the MCCI would be able to obtain access to a range, nor

did he think the MCCI would be willing to pay the cost. Jones Dep, 70:15 to 71:25. Second,

Sergeant Jones was concerned that the cold weather would impact the testing conditions and cause

Plaintiff to fail the test. *Id.* As a result, Plaintiff was not permitted to take the practical firearms

examination.

In response to Plaintiff's union grievance, Investigator Equils confirmed that Plaintiff

utilized FMLA leave on three occasions: December 17, 2014 through December 29, 2014; January

---

[3] The parties differ as to the sequence of events. Plaintiff's union grievance states that she spoke
to Sergeant Jones who informed her he would speak to Sergeant Tift. However, both Sergeant
Jones and Sergeant Tift testified at their depositions that Plaintiff first spoke to Sergeant Tift
about the matter, and Sergeant Tift brought the matter to his supervisor, Sergeant Jones, who
made the decision to deny Plaintiff's request. *See* Foster Cert, Ex. 10, Deposition of Tracey Tift
("Tift Dep."), T20:14-15, 28:2-7; Foster Cert,. Ex., 9, Deposition of Byron Jones ("Jones
Dep."), T72:13 to 73:4. The Court finds this factual dispute immaterial on this motion.

3, 2015 through January 4, 2015; and July 31, 2015 through August 21, 2015 and that those time periods were not considered when calculating Plaintiff's use of sick time. Gigle Cert., Ex. B. Subsequently, the MCCI Warden and the County Sheriff both denied Plaintiff's grievance, finding no violation of Plaintiff's union contract, based on the consideration of Plaintiff's sick leave and reaffirmed that Plaintiff's FMLA leave was not considered as part of the decision-making process. Gigle Cert, Ex. H at 5..

Several months later, after another applicant had been chosen for the permanent position, the Commission informed Ms. Ogborne that indivudals can only be removed from the eligible/failure roster if they lack the Commission's minimum requirements, or for other cause. Def. Facts, ¶¶39-41. Although Plaintiff did not satisfy the County's additional requirements, she met the Commission's minimum requirements.[4] *Id.* Thus, Plaintiff was restored to the list of eligible applicants. *Id.* at ¶41. After Plaintiff was restored to the list, the applicant who had been selected for the position was no longer among the top three candidates and had to be removed from the position. *Id.* at ¶41-42. Instead, Plaintiff and the next top two scorers Corrections Officers James Robertson and Richard Moran, two white males, were interviewed for the position. *Id.* at ¶44. Warden Nadrowski, Deputy Warden Sutton, Captain Roberts and Principal Investigator Equils were all present for Plaintiff's interview. *Id.* at ¶43. In deciding between the three candidates, the County purportedly utilized the additional qualifications from the provisional posting as preferences and sought a candidate with five-years of experience, an excellent attendance record, no major discipline, and a firearms qualification. *Id.* at ¶45. After interviewing

---

[4] The parties have not proffered a specific date when Defendant was notified by the Commission that Plaintiff had to be restored to the eligible/failure roster, but agree that it was "some months later." Def. Facts, ¶39.

Plaintiff and the other top two candidates, the County chose James Robertson for the position. *Id.* at ¶47. Mr. Robertson scored second on the promotional exam, one point lower than Plaintiff; he had no major disciplinary record; he had eight years of on the job experience; he had a good attendance record; and he was firearms qualified. *Id*; *see also* Equils Cert., at ¶41.

In October 2016, Plaintiff filed the instant Complaint, alleging that she was denied the promotion based on her race and gender in violation of NJLAD, and as retaliation for taking FMLA leave.[5] Defendant moves for summary judgement on both counts.

## II.   STANDARD OF REVIEW

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ .P. 56(c). A factual dispute is genuine only if there is "a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party," and it is material only if it has the ability to "affect the outcome of the suit under governing law." *Kaucher v. County of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment. *Anderson*, 477 U.S. at 248. "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-

---

[5] Under the FMLA, two types of claims are permitted: retaliation and interference. *Fraternal Order of Police, Lodge 1 v. City of Camden*, 842 F.3d 231, 245 (3d Cir. 2016); *see also* 29 U.S.C. § 2615(a)(1-2). Plaintiff's Complaint alleges only an FMLA retaliation claim. *See* Compl, Count II. To the extent Plaintiff's opposition raises a new claim of FMLA interference based on the alleged denial of FMLA leave in 2014, the Court declines to consider it. *Bey v. Daimler Chrysler Servs. of N. Am.*, No. CIV. 04-6186, 2006 WL 361385, at *11 (D.N.J. Feb. 15, 2006) ("[C]laims [that] were not alleged in the complaint . . . cannot be raised for the first time in opposition to a motion for summary judgment.").

moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255)); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, (1986); *Curley v. Klem*, 298 F.3d 271, 276-77 (3d Cir. 2002).

The party moving for summary judgment has the initial burden of showing the basis for its motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "If the moving party will bear the burden of persuasion at trial, that party must support its motion with credible evidence . . . that would entitle it to a directed verdict if not controverted at trial." *Id.* at 331. On the other hand, if the burden of persuasion at trial would be on the nonmoving party, the party moving for summary judgment may satisfy Rule 56's burden of production by either (1) "submit[ting] affirmative evidence that negates an essential element of the nonmoving party's claim" or (2) demonstrating "that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim." *Id.* Once the movant adequately supports its motion pursuant to Rule 56(c), the burden shifts to the nonmoving party to "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Id.* at 324; *see also Matsushita*, 475 U.S. at 586; *Ridgewood Bd. of Ed. v. Stokley*, 172 F.3d 238, 252 (3d Cir. 1999). In deciding the merits of a party's motion for summary judgment, the court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. Credibility determinations are the province of the factfinder. *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992).

There can be "no genuine issue as to any material fact," however, if a party fails "to make a showing sufficient to establish the existence of an element essential to that party's case, and on

which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322-23. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 323; *Katz v. Aetna Cas. & Sur. Co.*, 972 F.2d 53, 55 (3d Cir. 1992).

## III. <u>ANALYSIS</u>

### A. New Jersey Law Against Discrimination

Discrimination claims under NJLAD are analyzed under the burden-shifting framework set forth by the Supreme Court in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973), and later clarified in *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981) and *St. Mary's Honor Center v. Hicks*, 509 U.S. 502 (1993). *See Schurr v. Resorts Int'l Hotel, Inc.*, 196 F.3d 486, 498 (3d Cir. 1999) ("Analysis of a claim made pursuant to the NJLAD generally follows analysis of a Title VII claim"); *Bergen Commercial Bank v. Sisler*, 157 N.J. 188, 194 (1999) (citations omitted) (finding that claims of employment discrimination under Title VII or NJLAD are to be analyzed under the same standard).

To establish a prima facie case of discrimination in a failure to promote case, the plaintiff must show (1) that she was a member of a protected class; (2) that she applied and was qualified for a job for which the employer was seeking applicants; (3) that, despite her qualifications, she was rejected; and (4) that another, not in the protected class, was treated more favorably. *Fuentes v. Borough of Watchung*, 286 F. App'x. 781, 784 (3d Cir. 2008); *Jones v. Sch. Dist. of Philadelphia*, 198 F.3d 403, 410-12 (3d Cir. 1999); *Burdine*, 450 U.S. at 253- 54 & n.6; *McDonnell Douglas*, 411 U.S. at 802.

If a plaintiff succeeds in establishing a prima facie case, the burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for the employee's termination.

*Gerard v. Bridge Capital (USVI), LLC*, 282 F. App'x. 969, 972 (3d Cir. 2008). "The employer satisfies its burden of production by introducing evidence which . . . would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision." *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994). As the Third Circuit has noted, this burden is "relatively light" and "[t]he employer need not prove that the tendered reason actually motivated its behavior . . . ." *Id.* Relevant in a failure to promote case, "[a]n employer must be granted substantial discretion to exercise subjective judgment in the rendering of employment decisions . . . ." *Johnson v. Penske Truck Leasing Co.*, 949 F. Supp. 1153, 1172 (D.N.J. 1996) (citing *Burdine*, 450 U.S. at 259).

Here, Defendant concedes, for the purposes of this motion, that Plaintiff has established "a prima facie case for disparate treatment under NJLAD based on her failure to be promoted." Defendant's Brief in Support of Summary Judgment ("Def. Br."), at 24. Accordingly, the Court proceeds to the second step of the *McDonnell Douglas* analysis. Defendant contends that the County had legitimate, non-discriminatory reasons underlying its promotional decision, namely, that Plaintiff was not firearms-qualified and would not be able to become so until at least ten months after starting the new position, Plaintiff had less than five years of experience as a corrections officer, and had a less than satisfactory attendance record. *Id.* The Court finds that Defendant has satisfied its "relatively light" burden of proffering legitimate, nondiscriminatory reasons for declining to promote Plaintiff, particularly since these preferences were well known to Plaintiff at the time of her application. *Fuentes*, 32 F.3d at 763. Accordingly, the burden shifts back to Plaintiff in order to demonstrate that Defendant's stated reasons are pretextual or motivated by discriminatory rationale. *Fuentes*, 32 F.3d at 764.

To show pretext under the *McDonnell Douglas* framework, a plaintiff "must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Id.* at 764 (quoting *Tomasso v. Boeing Co.*, 445 F.3d 702, 706 (3d Cir. 2006)); *see also Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181, 198 (3d Cir. 2015). In order for a plaintiff to succeed in discrediting a defendant's articulated reasons, she must "demonstrate such weaknesses, implausibilities inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could rationally find them unworthy of credence." *Fuentes,* 32 F.3d at 765 (citing *Ezold v. Wolf, Block, Schorr & Solis-Cohen*, 983 F.2d 509, 531 (3d Cir. 1992)).

Plaintiff sets forth several bases for disbelieving Defendant's proffered reasons. As an initial matter, Plaintiff contends that 1) she satisfied all of the requirements listed on the posting for the permanent position; 2) Defendant has not provided an explanation for why it utilized the minimum requirements from the provisional posting as a basis for denying her the position; and 3) there is no evidence that the County's preferences were established in advance of Plaintiff's application. Pl. Br. at 2. In Plaintiff's view, two of the three reasons offered for her rejection – her lack of firearms qualification and the five-year on the job requirement – are specious, as the experience requirement only applies to individuals without a college degree, not Plaintiff, and Plaintiff could have obtained a special firearms qualification. *Id*. Plaintiff contends that "[Investigator] Equils kept the Plaintiff from making a special appointment with the rangemaster to get firearms qualified." Pl. Br. at 6. Further, Plaintiff reasons that other individuals were permitted to obtain a "special qualification" outside of the typical firearms testing period and she

specifically identifies Officer Craig Phillips as having been granted such a qualification and given a gun the same day, without undergoing the bi-annual certification process. Certification of Vanessa Howard ("Howard Cert"), ¶19. As to sick time, Plaintiff contends that the analysis of sick time is subjective, thus inherently suspect. Pl. Br. at 9. Further, Plaintiff argues that she was the best candidate for the position as evidenced by her master's degree and top score on the civil service exam, while the individual chosen in her stead did not possess a college degree, and his selection was a pretext for the County's discriminatory intent. *Id.* at 10-11. Finally, Plaintiff contends that the internal affairs section is "all-white and all male" and points to the lack of black female officers in the Sheriff's department as evidence of Defendant's discriminatory disposition. *Id*. at 14; *see also* Plaintiff's Counterstatement of Facts ("Pl. Facts") ¶¶33-37.

The Court finds that Plaintiff's arguments fail to establish pretext. As an initial matter, analyzing whether Defendant's proffered reasons are pre-textual does not require the Court to ascertain which applicant, in earnest, was more qualified for the promotion, but rather whether Plaintiff has presented any evidence demonstrating that the promotional decision was based on discriminatory animus. *See Fuentes*, 32 F.3d at 765 ("To discredit the employer's proffered reason, however, the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent"); *Bennun v. Rutgers State University*, 941 F.2d 154, 170 (3rd Cir. 1991) ("This Court has held that more than a denial of promotion as a result of a dispute over qualifications must be shown to prove pretext."). Accordingly, Plaintiff's evidence that she was allegedly better qualified than the individual who

obtained the permanent position carries little weight.[6]    Although Plaintiff's qualifications inarguably satisfied the Civil Service's minimum requirements for the position, the County was permitted to choose any one of the top three candidates.  *Commc'ns Workers of Am., AFL-CIO*, 191 A.3d at 667.  Furthermore, the County was also free to consider additional discretionary factors, so long as those factors are not discriminatory, and were applied equally to all the candidates.  *In re Foglio,* 22 A.3d 958, 963 (N.J. 2011) (explaining that "the Rule of Three does not stand as an immutable or total bar to the application of other important criteria by a government employer.")(citation and internal quotation marks omitted).   In that regard, Plaintiff has not proffered any evidence indicating that the County's preferences were *ad hoc* fabrications imposed solely to disqualify her.   Rather,  Defendant has shown that its preferences: a minimum of five years of experience, no major discipline on record, an excellent attendance record and being firearms certified, were established before the administration of Plaintiff's civil service exam and her application for the position, as they were delineated in the provisional posting for the provision. More importantly, these preferences were applied to all the candidates who were granted an interview.

Indeed, it is undisputed that Plaintiff did not satisfy two of the County's three preferences, the five-year employment criteria and being firearms qualified.  At the time of the promotion decision, Plaintiff had less than four years' experience as a corrections officer.  Although the Commission's minimum qualifications only required one year of on the job experience, the County was fully within its discretion to express a preference for an applicant with more experience.

---

[6]  Furthermore, Plaintiff's Master's degree in City and Regional Planning, albeit a laudable accomplishment, lacks manifest connection to the position she sought.  *See* Foster Cert, Ex. 11, Plaintiff's Resume.

Moreover, Plaintiff does not dispute that at the time of her application, she was not firearms qualified and had not been for nearly a year. Rather, she contends that she attempted to become firearms qualified but was thwarted by Investigator Equils. Pl. Br. at 6. Other than her speculation, Plaintiff has not pointed to any evidence in the record suggesting that Investigator Equils intervened in order to prevent her from obtaining a firearms qualification. The sworn testimony of several witnesses established that the decision was made by Sergeant Jones, an African American male.[7] Investigator Equils testified that he never told Plaintiff that she could not take the practical firearms test and that any decision regarding special testing was within the purview of the training supervisor and firearms supervisor. In that respect, both Sergeants Tift and Jones testified that Sergeant Jones made the ultimate decision not to allow Plaintiff to take the practical examination, outside of the regular testing period, and that they did not speak to Investigator Equils or anyone other than each other regarding the matter. Plaintiff has not shown otherwise.

Further, even if Plaintiff had been permitted to take the practical firearms test shortly after or prior to her submitting her application for the promotion in late 2015, Plaintiff still would not have been firearms qualified as the Attorney General's Guidelines require an individual to complete *two* practical firearms tests *within a calendar year*, in addition to taking a firearms course. As indicated earlier, Plaintiff allowed her firearm qualification to lapse sometime in 2014. Plaintiff had not previously completed a firearms practical test in the year 2015, nor had she taken the firearms course. Accordingly, the earliest Plaintiff could become firearms qualified was Fall 2016 – nearly a year after her application for the position. Furthermore, to the extent Plaintiff suggests that she could have obtained a special firearms certification on an expedited basis without

---

[7] *See* Foster Cert, Ex. 3, Deposition of Rene Roberts ("Roberts Dep."), 25:20-22 ("Q: Byron Jones is an African American male; correct? A: yes")

undergoing the biannual certification process, that contention is belied by the record currently before the Court. A review of the Attorney General's Guidelines and the MCCI Policies and Procedures reveals no exceptions to the biannual certification process. *See* Foster Cert., Ex. 14, "Monmouth County Sheriff's Office Policy and Procedures"; *see also* Equils Cert., Ex. A, Guidelines. Although several witnesses testified that special arrangements were occasionally made to allow officers to take the shooting qualification test outside of the typical testing frame, such arrangements were only permitted under special circumstances where an individual was out on military leave, or out sick, and returns within a certain time frame. Foster Cert, Ex. 2 Equils Dep, T39:13-17; Ex. 10 Tift Dep, T23:14-20. Furthermore, such special testing arrangements would not be applicable to an individual who had not taken the practical qualification test earlier that year. Jones Dep., T66:8-20. As Sergeant Jones testified, if an individual misses the spring practical firearms qualification testing, that person simply cannot become firearms qualified that year. *Id*. Accordingly, there is no genuine dispute of fact as to whether Plaintiff could have become firearms qualified on an expedited basis.[8]

---

[8] Plaintiff contends in her Certification that another officer, Craig Phillips, was permitted to obtain a firearms Certification without undergoing the requisite three-month process, but that officer refused to provide a certification to the Court. Although "hearsay statements can be considered on a motion for summary judgment if they are capable of admission at trial," Plaintiff has not made any argument as to the statement's admissibility. *Shelton v. Univ. of Med. & Dentistry of N.J.*, 223 F.3d 220, 223 at n. 2 (3d Cir. 2000). Plaintiff's unsubstantiated, hearsay statements are insufficient to raise a genuine issue of material fact, and the Court declines to consider them. But, more importantly, while Plaintiff generally contends that the MCCI had the ability to grant special qualifications; Plaintiff has not suggested that Defendant permitted other applicants for promotions to obtain a special qualification but denied Plaintiff the opportunity to do the same. *See Baldwin v. Gramiccioni*, No. 161675, 2019 WL 2281580, at *8 (D.N.J. May 29, 2019)("when presenting comparator evidence, on summary judgment, a plaintiff must submit evidence that she is "similarly situated" to her comparators and that these employees have been treated differently or favorably by their employer."). Accordingly, the matter of special firearms qualifications has little bearing on whether Plaintiff was treated differently from other applicants for the promotion.

Plaintiff also challenges the "excellent attendance" requirement, decrying it as a subjective criterion meant to shield Defendant's discriminatory intent; however, the subjective criteria in this case have not been shown to be inherently suspect. Where subjective criteria are involved "the plaintiff can prove the articulated reason is unworthy of credence by presenting persuasive comparative evidence that non-members of the protected class were evaluated more favorably, *i.e.,* their deficiencies in the same qualification category as the plaintiffs were overlooked for no apparent reason." *Ezold*, 983 F.2d at 531. Here, Plaintiff has not made such a showing. Although neither party has submitted the other applicants' attendance records, both Officers Robertson and Moran, the two other interviewees for the permanent Investigator position, testified that sick time was important to MCCI, was often considered in hiring decisions, and that they were both asked about their use of sick time during the own promotional interviews. *See* Foster Cert, Ex. 5, Deposition of James Robertson, 27:6-1; Gigl Cert, Ex. L, Deposition of Richard Moran, T12:22-13:25. The County has also proffered legitimate business reasons for the attendance policy, contending that the policy is meant to ensure that individuals serving in leadership roles exhibit their leadership skills by showing up at work on a regular basis. *See* Equils Cert., ¶13. Indeed, while Plaintiff used her sick leave within the contractually permitted limits, the County is, nevertheless, entitled to evaluate whether the use of those sick days – in the context of choosing which individual to promote – was excessive.[9] *See in re Hruska*, 867 A.2d 479, 484 (App. Div. 2005) (explaining "[u]nder the rule of three, an appointing authority . . . has the statutory discretion to appoint any one of the top three candidates who the public employer

---

[9] Additionally, Plaintiff acknowledged that she periodically utilized sick leave when she was not sick. Gigl Cert., Ex. C, Howard Dep., T93:13 to 102:13; *see also* Def. Facts ¶57. Furthermore, Plaintiff's sick leave usage occasionally aligned with Plaintiff's regular days off, holidays, and personal days. Gigl Cert., Ex. C, Howard Dep., T93:13 to 102:13.

considers best suited to fill the position" and can bypass an applicant "for any legitimate reason based upon the candidate's merit."); s*ee also Ezold*, 983 F.2d at 534 ("In a comparison of subjective factors . . . it must be obvious or manifest that the subjective standard was unequally applied before a court can find pretext.") Absent any showing that Defendant used this subjective criterion discriminatorily, Plaintiff's argument that the attendance requirement was pretextual is unavailing. Accordingly, Plaintiff has failed to meet her burden of demonstrating that Defendant's proffered reasons were merely pretextual.

Plaintiff has also failed to provide sufficient evidence to allow a reasonable factfinder to find that Defendant was more likely than not motivated by discrimination. Plaintiff's sole arguments on that point are that Investigator Equils allegedly displayed racial and gender bias in favor of white employees, that he invited white officers to his house for a barbecue, but no black officers attended, Pl. Br. at 11, and that the internal affairs unit is "all-white and all male," *id.* at 14. Although Investigator Equils was tasked with making the hiring decision, the record makes clear that he did not do so alone; the MCCI Warden and two captains were also present for Plaintiff's interview and participated in the decision-making process. Def. Facts, ¶43. Investigator Equils had input from the Human Resources Department, and the hiring decision was based on Plaintiff's inability to satisfy the County's preferences. Ultimately, Plaintiff's disagreement with the assessment criteria and her subjective belief that she was more qualified for the position are not sufficient to avoid the grant of summary judgment.

In sum, the Court finds that Plaintiff has failed to rebut the nondiscriminatory motivation proffered by Defendant. Plaintiff has neither presented evidence sufficient to discredit Defendant's proffered reasons, nor has she adduced evidence from which a reasonable fact-finder could conclude that an "invidious discriminatory reason was more likely than not" the motivating

force behind Defendant's actions. *Fuentes*, 32 F.3d at 764. Accordingly, summary judgment on Plaintiff's NJLAD claim is appropriate.

### B. Family Medical Leave Act

When analyzing an FMLA retaliation claim based on circumstantial evidence, the court utilizes the same three-step burden shifting *McDonnell Douglas* framework that it uses to analyze an NJLAD discrimination claim. *See Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294, 301–02 (3d Cir. 2012). Under the first step of this framework, the plaintiff must establish a prima facie case of retaliation by demonstrating "that (1) she invoked her right to FMLA-qualifying leave, (2) she suffered an adverse employment decision, and (3) the adverse action was causally related to her invocation of rights." *Id.* Once the plaintiff establishes the prima facie elements of retaliation, then the defendant must provide legitimate, non-retaliatory reasons for the employment decision. *Kautz v. Met–Pro Corp.*, 412 F.3d 463, 465 (3d Cir. 2005). At that point, the plaintiff has the burden to present evidence of the employer's retaliatory motive to demonstrate that the legitimate reasons articulated by the employer were merely a pretext for retaliatory intent. *Id.*

Here, Plaintiff's FMLA retaliation claim alleges that Defendant's refusal to promote her to the position of Inspector of Secured Facilities was an act of reprisal for Plaintiff's use of FMLA leave in 2014 and 2015, and that by considering her sick leave, the County also, effectively, penalized her for taking FMLA leave. Pl. Br. at 15. Further, Plaintiff contends that she was improperly denied FMLA leave in November 2014 and utilized her sick leave instead, therefore, some of her sick leave time was, in fact, FMLA-qualifying leave. Pl. Br. at 16.

As an initial matter, Plaintiff improperly conflates FMLA leave and sick leave. FMLA leave and sick leave are legally distinct, with FMLA leave arising pursuant to Federal law and the right to sick leave accruing pursuant to the correction officer's collective bargaining agreement. The

FMLA itself recognizes the distinction. *See* 29 U.S.C. § 2652(a-b) (providing that "the rights established for employees under [the FMLA] shall not diminish" or "be diminished by any collective bargaining agreement, or any employment benefit program or plan."). The FMLA was enacted to prohibit employers from retaliating against employees who exercise their rights and to prohibit employers from interfering with the exercise of an employee's FMLA rights. *See* 29 U.S.C. §2615 (delineating prohibited acts under the FMLA). Considering Plaintiff's use of sick leave in the context of a promotional decision does neither. Consequently, nothing in the FMLA prevented the County from considering Plaintiff's use of sick leave as a factor in deciding which employee to promote. Accordingly, Plaintiff's FMLA retaliation claim can only be based on her use of FMLA leave from December 17, 2014 through December 29, 2014; January 3, 2015 through January 4, 2015; and July 31, 2015 through August 21, 2015.

Here, the parties agree that Plaintiff can satisfy the first two elements of her prima facie case, she invoked her right to FMLA-qualifying leave and she suffered an adverse employment event upon being denied the promotion to the position of Investigator of Secured Facilities. However, Defendant contends that Plaintiff cannot establish the third element, because there is no causal link between her FMLA leave and any alleged adverse employment action. Def. Br. 33.

Whether a causal link exists between the protected activities and the defendant's promotion decision "must be considered with a careful eye to the specific facts and circumstances encountered." *Farrell*, 206 F.3d at 279 n. 5. "To demonstrate a causal connection, a plaintiff generally must show 'either (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link.'" *Budhun v. Reading Hosp. & Med. Ctr.*, 765 F.3d 245, 258 (3d Cir. 2014) (quoting *Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007)); *see also*

*Hargrave v. County of Atlantic*, 262 F. Supp. 2d 393, 425 (D.N.J.2003("The two most common indicia of causation are "timing and evidence of ongoing antagonism.").

Evidence of temporal proximity, alone, is sufficient to establish causation only "[i]n certain narrow circumstances." *Marra v. Philadelphia Hous. Auth.*, 497 F.3d 286, 302 (3d Cir. 2007). The Third Circuit has identified several examples of temporal proximity suggesting retaliatory conduct, including the following: deciding to replace the plaintiff during the plaintiff's FMLA leave and informing the plaintiff that she had been replaced two days after her FMLA leave ended; terminating the plaintiff less than a week after the plaintiff invoked her right to FMLA leave; terminating the plaintiff several days after the plaintiff took FMLA leave; and terminating the plaintiff three months after requesting FMLA leave and the day she was scheduled to return to work. *Budhun*, 765 F.3d at 258 (collecting cases). In the absence of temporal proximity, a court may consider "the circumstances as a whole, including any intervening antagonism by the employer, inconsistencies in the reasons the employer gives for its adverse action, and any other evidence suggesting that the employer had a retaliatory animus when taking the adverse action." *Daniels v. Sch. Dist. of Philadelphia*, 776 F.3d 181, 196 (3d Cir. 2015) (quoting *LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 232 (3d Cir.2007)).

The Court finds that Plaintiff has potentially established a causal link between the County's promotional decision and Plaintiff's use of FMLA leave in August 2015. Plaintiff utilized FMLA leave on three separate occasions in 2014 and 2015, with the final leave occurring in August 2015, three months before the release of the Civil Service exam results in November 2015. Accordingly, the promotional decision may be considered sufficiently proximate to Plaintiff's FMLA leave to fall within the outer bounds of "unusually suggestive." *See Budhun*, 765 F.3d at 258 (finding two-month gap between FMLA leave and plaintiff's termination sufficient to be

"unusually suggestive"); *see also Bryson v. Regis Corp.*, 498 F.3d 561, 571 (6th Cir.2007) (holding that employee who was notified of her termination three months after requesting FMLA leave and the day she was scheduled to return to work established a causal connection).

However, even if temporal proximity were satisfied, Plaintiff's FMLA retaliation claim fails at the next stage of the *McDonnel Douglas* analysis. As detailed above, the County has proffered legitimate, non-discriminatory reasons for declining to promote Plaintiff, namely her inability to satisfy the County's additional qualifications. Thus, the burden shifts to Plaintiff to establish that the County's justifications are a mere pretext for retaliatory conduct stemming from Plaintiff's FMLA leave.

Plaintiff suggests that the County's consideration of her sick leave incorporated her use of FMLA leave. To the contrary, the record makes clear that Plaintiff's use of FMLA leave was not a consideration in the County's decision-making process. Investigator Equil's calculation of Plaintiff's sick leave usage categorically excluded all the time periods where Plaintiff was out on FMLA leave. *See* Equils Cert, Ex. F, "Plaintiff's Attendance Records." Plaintiff also points to the County's denial of FMLA leave for her grandmother's care, as further evidence of pretext and the County's opposition to the use of FMLA leave. However, to the extent Plaintiff wanted to challenge that denial of her FMLA leave, she was required to amend her complaint to include claims of FMLA interference. An allegation of FMLA interference cannot be utilized to bootstrap a deficient FMLA retaliation claim. *Callison v. City of Phila.*, 430 F.3d 117, 120 (3d Cir. 2005)(" An interference action is not about discrimination, it is only about whether the employer provided the employee with the entitlements guaranteed by the FMLA.") Moreover, Plaintiff successfully went on to utilize FMLA leave on three occasions after her initial request in November 2014. Plaintiff has not satisfied her burden of "demonstrate[ing] such weaknesses, implausibilities,

inconsistencies, incoherencies, or contradictions in [the County's] proffered legitimate reasons for its actions that a reasonable factfinder could rationally find them 'unworthy of credence.'" *Fuentes*, 32 F.3d at 765.  Furthermore, as discussed above, even discounting the County's reliance on Plaintiff's use of sick leave,  has articulated legitimate, non-discriminatory reasons for its promotion decision -- Plaintiff could not satisfy two of the county's three preferences for the position as she was not firearms qualified and did not possess five-years' experience.  Plaintiff has not demonstrated that those proffered reasons are pretextual, thus the County is entitled to summary judgment.

IV.     **CONCLUSION**

For the reasons set forth above, Defendant's Motion for Summary Judgment is granted in its entirety.

Date: June 28, 2019

/s/ Freda L. Wolfson
Hon. Freda L. Wolfson
U.S. Chief District Judge
